RENDERED: NOVEMBER 4, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0103-MR

BILLY MELTON                          APPELLANT

               APPEAL FROM MONROE CIRCUIT COURT
v.              HONORABLE DAVID L. WILLIAMS, JUDGE
                 ACTION NO. 04-CR-00089

COMMONWEALTH OF KENTUCKY           APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: JONES, MAZE, AND McNEILL, JUDGES.

McNEILL, JUDGE: On December 21, 2005, a jury convicted the appellant, Billy

Melton, of murder, two counts of rape in the first degree, complicity to commit

tampering with physical evidence, and intimidating a witness. He was sentenced

to life imprisonment. *See Melton v. Commonwealth*, No. 2006-SC-000080-MR,

2007 WL 4139640, at *1 (Ky. Nov. 21, 2007). This is an appeal from an order of

the Monroe Circuit Court denying Billy Melton's July 17, 2019 motions to vacate his 2005 conviction and sentence pursuant to CR[1] 60.02, and for the presiding judge to recuse. Upon review, we affirm.

## I. CR 60.02 Motion

In sum, Melton's CR 60.02 motion at issue in this appeal was properly denied because it presented arguments Melton either could have made in prior proceedings, did make in prior proceedings, or that he was otherwise procedurally barred from making due to the time limitations set forth in the civil rule. Before discussing the substance of those arguments, however, it is necessary to review the history of this case, starting with the relevant facts of Melton's underlying conviction, which the Kentucky Supreme Court summarized when it resolved Melton's direct appeal:

> Melton was indicted on various offenses arising from the death of Jodi Pace. On September 17, 2004, Pace, a fourteen-year-old, had gone to spend the night with Kassandra Hudson, her eighteen-year-old friend. Together the girls contacted Melton to see if he could obtain methamphetamine for them. After several calls, Melton agreed to pick up the girls.
>
> Amanda Coe, Melton's cousin, lived with him at the time of the incident. Melton, Coe, and Coe's baby went to pick up Pace and Hudson. Upon arriving at Melton's home in Tompkinsville, Pace and Hudson were informed that Melton had not yet obtained the methamphetamine for them. While they waited, Coe

---

[1] Kentucky Rule of Civil Procedure.

-2-

witnessed Melton giving the two girls a handful of pills and marijuana. Coe testified that Melton gave them [Lorcet], Percocet, Oxycontin, Xanax, and an unidentified pill. At some point Melton agreed to provide Pace and Hudson with one gram of methamphetamine each in return for sex. Shortly after that, Melton had sexual relations with the girls.

Pace and Hudson began to question Melton about the methamphetamine, so he gave them more pills. According to the testimony of Scottie Key and Clinton Rowe, Melton then had sexual relations with both girls again, although they were then passed out. Key and Rowe, who had shared a cell with Melton after his arrest, came forward and testified concerning various statements he had made in their presence in which he had bragged about the events that night. The testimony of Key and Rowe confirmed the sex-for-methamphetamine theory. In addition, both testified that on various occasions Melton had specifically said he had given the drug Seroquel to Pace.

At some point in the early hours of September 18th, Coe informed Melton that Pace was not well and that they should get her help. Melton refused and threatened to harm Coe if she attempted to use the phone. Later that morning, Melton was informed that Pace was unresponsive. Melton, aware that Pace had overdosed, delayed calling for help in order to give Coe time to collect the pill bottles and dispose of them in the woods adjoining his property. Further, Melton threatened to harm Coe if she told authorities what had happened. Once the pills were removed and Hudson was hidden, Melton called 911 for an ambulance.

An ambulance was dispatched to Melton's residence at 9:21 a.m. During his conversation with the 911-operator, Melton claimed he did not know who the girl was. He stated that she had arrived with three other girls the evening before. Further, Melton stated that the

girls were visiting with Coe when he went to sleep on the couch, but that Pace had not responded when they tried to wake her that morning. Pace was taken to the hospital and pronounced dead on arrival by the Monroe County Deputy Coroner.

Once the ambulance left with Pace, Melton and Coe took Hudson back and dropped her off near her home. As a result of the night's events, Hudson was also taken to the hospital. It was there that officers found her later on September 18th.

Officers from the Kentucky State Police (KSP) became involved shortly after Pace arrived at the hospital. KSP Detectives interviewed Melton on the afternoon of September 18, 2004. Melton provided a story similar to that given to the 911-operator. With Melton's written consent, the officers searched Melton's house, his car, and the surrounding property. As a result of that search, the officers recovered various pill bottles, rolling papers, and a can modified for use with methamphetamine.

Melton was subsequently interviewed at the Monroe County Sheriff's office. KSP Detective Atwood, having obtained a conflicting story from Coe, gave Melton his Miranda warnings and began a taped interview. Once again, Melton told the detective that four girls had arrived the night before to visit Coe. Melton repeated his assertion that no alcohol or drugs were used while he was present and that Pace had been fine when he went to sleep. When questioned, Melton did admit to having sexual relations with two of the girls. Melton told Detective Atwood that it had been a "group deal" with the two girls. After completing his statement, Melton admitted that marijuana had been used. He stated he had not mentioned it because he did not believe it was a drug. After further reflection, Melton told Detective Atwood that if he gave him the tape of the first interview, he would give him another statement. Detective Atwood

-4-

informed Melton that he could not do that, but that he would listen to anything Melton wanted to say. Melton made no further statements. Melton was arrested following this interview.

An autopsy on Pace revealed that the cause of death was an overdose of Seroquel. Lab reports also revealed the presence of Xanax, oxycodone, and hydrocodone. Given the circumstances surrounding Pace's death, officers obtained a rape collection kit on both Pace and Hudson. After obtaining a warrant, a rape suspect collection kit was obtained from Melton. Lab tests showed that samples of DNA taken from both Pace and Hudson matched Melton's DNA. In addition, Hudson's sample contained DNA from an unknown source.

*Melton*, 2007 WL 4139640, at *1-2. After rejecting Melton's only two contentions

on direct appeal – that the trial court had erred by denying his motions to continue

the trial and for a change of venue – the Court affirmed Melton's conviction and

sentence.

Thereafter, Melton initiated a variety of post-judgment proceedings,

some of which overlapped during the years that followed. On October 19, 2009,

pursuant to RCr[2] 11.42, Melton filed a motion to vacate, claiming his trial counsel

had been ineffective because, among other reasons, his trial counsel had reason to

question his competency prior to his trial but failed to request a hearing; and

because his trial counsel had failed to consult with a pathologist to discredit the

---

[2] Kentucky Rule of Criminal Procedure.

-5-

testimony of Dr. Tracey Corey, the Commonwealth's medical examiner, who had testified that Pace died as a result of an overdose of Seroquel. *Melton v. Commonwealth*, No. 2009-CA-2271-MR, 2011 WL 2078590, *3-5 (Ky. App. May 27, 2011). The trial judge summarily denied Melton's motion; this Court affirmed; and the Kentucky Supreme Court denied discretionary review.

On January 3, 2014, Melton filed a petition for writ of mandamus against Judge Eddie Lovelace, who had presided over his trial. We dismissed his petition on May 14, 2014, for his failure to pay the requisite $5.00 filing fee. *Melton v. Lovelace*, No. 2014-CA-000047-OA.

On October 2, 2013, Melton filed a petition for writ of habeas corpus in the Monroe Circuit Court. His petition was denied on August 18, 2014. And, in a March 25, 2015 order, this Court affirmed, explaining that the argument he had advanced in his petition – that his conviction was void *ab initio* because he was allegedly not evaluated concerning his competency to stand trial – had already been presented to the trial court and this Court in his RCr 11.42 proceedings; and that because Kentucky law had already provided Melton a more appropriate forum for his grievance, habeas corpus relief was not available to him. *Melton v. Commonwealth*, No. 2014-CA-001466-MR. On February 10, 2016, the Kentucky Supreme Court denied discretionary review. *Melton v. Commonwealth*, No. 2015-SC-000172-D.

On August 10, 2020, Melton filed another petition for writ of mandamus, this time against Judge David L. Williams, who presided over his CR 60.02 motion. This Court denied the petition on November 25, 2020. *Melton v. Williams*, No. 2020-CA-0502-OA. Melton did not seek further review.

And with that in mind, we step back to July 17, 2019, when Melton filed the CR 60.02 motion at issue in this matter before the Monroe Circuit Court. There, he made three[3] contentions. First, he argued the trial court had erred in failing to raise and address the issue of his competency *sua sponte* because, he believed, it had been on notice prior to his trial of facts sufficient to place his competence to stand trial in question. He asserted the "trial court was fully aware of his prior existing and readily debilitating, and often incapacitating over-medicating, in conjunction with an IQ score of 58, all duly influenced by the lifetime of mental problems which plague him and interfere with his ability to meaningfully interact with others." Thus, as he had done in his October 19, 2009 RCr 11.42 motion, and also in his October 2, 2013 writ petition, Melton contended a new trial was warranted because he had not been provided a pretrial competency hearing.

---

[3] Melton listed four "issues" in his CR 60.02 motion, but his fourth essentially repeated his second; both asserted, in somewhat differing language, that the circuit court had erred by failing to provide him a competency hearing prior to his trial.

For his second and third arguments, recall that in the RCr 11.42 proceeding he initiated in 2009, Melton had faulted his trial counsel for failing to consult with a pathologist to discredit the testimony of Dr. Tracey Corey, the Commonwealth's medical examiner who had testified that Pace died as a result of an overdose of Seroquel. Resolving that issue in his prior appeal, this Court had explained, "Melton does not offer any evidence that he knew of a specific expert who was willing to testify in a manner helpful to the defense or of what such testimony would consist." *Melton*, 2011 WL 2078590, at *5.

However, in 2019, Melton found an individual he deemed an expert, who was willing to testify in a manner helpful to his defense, and who had indeed supplied him with an extensive affidavit detailing what his expert testimony would be. The "expert" in question was Douglas H. Rank, a fellow inmate who had been a licensed physician and psychiatrist. Rank stated in his affidavit that his opinion was based upon his review of the following documents:

> 1. FINAL DIAGNOSIS on PACE, JODI ME-04-832
> ("J.P.") Completed by Tracey Corey, MD, on 11/08/2004
> (Exhibit #1)
>
> 2. POST MORTEM EXAMINATION OF THE BODY
> OF PACE, JODI ME-04-832 Completed by Tracey
> Corey, MD, on 09/19/2004 (Exhibit #2)
>
> 3. TRANSCRIPTION from the trial of Billy Melton,
> 10/28/2005, starting at 3:09:15 p.m. These are the
> remarks by the Commonwealth Attorney, Charlton C.
> Hundley, to Billy Melton's jury. (Exhibit #3)

4. Medication Follow-Up Sheet, Lifeskills, Inc. for Billy Melton, 8-12-02 through 10-27-04.

5. "Fatal Overdoses Associated with Quetiapine," by Loralie J. Langman, et. al. Journal of Analytical Toxicology, Vol. 28, September 2004.

6. Physician's Desk Reference ("PDR")

As to the substance of his opinion, it was three-fold. Citing item "4" of the documents he reviewed – which listed the various medications Melton had been prescribed prior to Melton's trial – he agreed with Melton's contention that Melton had been over-medicated prior to trial, and that his competency to stand trial therefore should have been in question. Next, he opined that his experience, the documentation he had reviewed, as well as the medical literature available prior to Melton's trial, all indicated that Pace could not have died from ingesting Seroquel; that oxycodone or hydrocodone could not have contributed to Pace's death; and that Melton could not have had sexual intercourse with Pace while she was physically helpless. Lastly, he concluded Dr. Corey was unreasonable, and perhaps negligent, in concluding otherwise.

From Rank's affidavit, Melton formulated his second and third CR 60.02 arguments. Regarding his second argument, Melton contended Rank's opinion constituted "new evidence" of which he had only recently become aware; and that because it completely exonerated him, Rank's opinion entitled him to a

new trial "under the umbrella of CR 60.02(e)[4] and/or (f)." Regarding his third argument, Melton contended he was entitled to a new trial because Rank's affidavit demonstrated Hudson and Coe – two of the witnesses examined at his trial – must have committed perjury when they testified Melton had provided Pace Oxycontin and Lorcet prior to her death; and that Dr. Corey must have presented false evidence at trial.

The circuit court denied Melton's motion. Over the course of its April 24, 2020 order to that effect, as well as an August 28, 2020 order overruling Melton's subsequent petition for reconsideration, the circuit court explained its reasoning. First, it noted Melton had previously asserted – in his RCr 11.42 motion – that his ability to cognitively function was a basis for setting aside his conviction; and that the courts had already addressed that issue. Second, it found that the passage of over fifteen years between Melton's final sentence and CR 60.02 motion was not a reasonable amount of time and was far too long to warrant granting Melton's requested relief. Third, it explained:

> This Court cannot ascertain any evidence of a conclusive
> or clear and convincing character that evinces fraud in
> the proceeding. Melton's basis for his motion relies
> heavily on an affidavit submitted by Douglas H. Rank.

---

[4] Below, Melton cited nothing indicating, per CR 60.02(e), that his judgment of conviction "is void, or has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." Nor does he cite this specific provision in his appellate brief; nor, for that matter, does the record support such a contention.

Mr. Rank. A former physician, is currently serving a fifteen (15)-year sentence for assaulting a patient with a sword.[FN]

> [FN] See Commonwealth v. Douglas Rank, Kenton Circuit Court 10-CR-00186

Mr. Rank surrendered his license to practice medicine in February of 2011. Based upon these facts, this Court cannot determine that Mr. Rank's allegations are credible enough to support the granting of a CR 60.02 trial.

Melton now appeals, reasserting his CR 60.02 arguments. Regarding his first argument, no error occurred. It is well-established that the remedy provided under CR 60.02 is extraordinary and only available to raise issues that could not have been raised in other proceedings. *McQueen v. Commonwealth*, 948 S.W.2d 415 (Ky. 1997). CR 60.02 is unavailable "to raise claims which could and should have been raised in prior proceedings, but, rather, 'is for relief that is not available by direct appeal and not available under RCr 11.42.'" *Sanders v. Commonwealth*, 339 S.W.3d 427, 437 (Ky. 2011) (quoting *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky. 1983)). Here, as the circuit court noted, Melton argued in his RCr 11.42 motion that his purported inability to cognitively function served as a basis for relieving him of his judgment. Further, the circuit court correctly noted that issue was addressed and resolved in those prior proceedings. If Melton's lack of competence was as clear and obvious prior to his trial as Melton continues to represent, the issue also could have, and should

-11-

have, been raised in his direct appeal pursuant to RCr 10.26 for palpable error review.

Regarding his second and third arguments, both are untimely. To begin, the operative time limits specified in CR 60.02 commence after the entry of judgment, not the finality of any appellate or post-judgment proceedings. *Meredith v. Commonwealth*, 312 S.W.2d 460, 462 (Ky. 1958). Thus, to the extent Melton asserts "perjury or falsified evidence" as bases for a new trial, his fifteen-year delay precluded him from making such arguments. *See* CR 60.02(c) (providing such arguments must be made no later than one year after entry of judgment).

Moreover, while Rank's "expert" opinion might be "new" to Melton, it is not "new evidence" within the meaning of CR 60.02(b), let alone new evidence of such "an extraordinary nature," per CR 60.02(f), that it could not have been discovered within one year of his conviction.[5] As our Supreme Court explained in *Foley v. Commonwealth*, 425 S.W.3d 880, 887 (Ky. 2014), relative to both CR 60.02(b) and (f),

> "Newly discovered evidence is evidence that could not have been obtained at the time of trial through the exercise of reasonable diligence." *Commonwealth v. Harris*, 250 S.W.3d 637, 642 (Ky. 2008). *See also Sanders v. Commonwealth*, 339 S.W.3d 427, 437 (Ky. 2011) (holding that CR 60.02 allows appeals based upon claims of error that "were unknown and could not have

---

[5] CR 60.02(b) requires any motion based upon "newly discovered evidence" to be made no later than one year after entry of judgment.

-12-

been known to the moving party by exercise of reasonable diligence and in time to have been otherwise presented to the court"). Certainly, testimony in the form of an expert's opinion is "evidence" in the literal sense. KRE 702. But an expert's opinion cannot fit the definition of "newly discovered evidence" unless it is based upon underlying facts that were not previously known and could not with reasonable diligence have been discovered. An opinion consisting simply of a reexamination and reinterpretation of previously known facts cannot be regarded as "newly discovered evidence." There would be no finality to a verdict if the facts upon which it was based were perpetually subject to whatever reanalysis might be conceived in the mind of a qualified expert witness.

Here, Rank's "expert opinion" was based entirely upon his reexamination and reinterpretation of facts that were either known – or in Rank's view, should have been known – prior to Melton's trial. Indeed, even the medical literature Rank cited in his review – including the edition of the "Physician's Desk Reference" he relied upon – predated Melton's trial. Therefore, even if Rank's opinion could be lent credence as "evidence," it did not qualify as "new evidence" capable of invoking CR 60.02.

Our Supreme Court has warned that because of the desirability of according finality to judgments, CR 60.02(f) must be invoked only with extreme caution, and only under most unusual circumstances. *Cawood v. Cawood*, 329 S.W.2d 569 (Ky. 1959). That is most definitely not the case in this matter: Melton merely made arguments that have, could have, or should have been made prior to

-13-

his trial, reinforcing that nothing has changed, and no extraordinary circumstance has come into being, since his 2005 conviction. We therefore affirm the circuit court's decision to deny his motion.

## II. Recusal Motion

In conjunction with his CR 60.02 motion, Melton also sought to have the presiding judge, David L. Williams, recuse. He argued Judge Williams was biased against him and therefore incapable of fairly resolving his CR 60.02 motion because: (1) he was Judge Williams' blood relative; and (2) he owed Judge Williams an outstanding sum of money for legal services *then-attorney* Williams rendered for him in 1982 in connection with a prior charge of theft. On appeal, he argues Judge Williams erroneously denied his motion.

However, we reemphasize that Melton's CR 60.02 arguments were procedurally barred *regardless*. That aside, Melton's contentions that he is related to Judge Williams and owed him money were: (1) denied by Judge Williams in his dispositive order; and (2) supported only by Melton's unsworn allegations. We will not accept conclusory allegations as proof in this regard. "The burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts of a character calculated seriously to impair the judge's impartiality and sway his judgment." *Alred v. Commonwealth, Jud. Conduct Comm'n*, 395 S.W.3d 417, 429 (Ky. 2012) (internal quotation marks and footnotes omitted). Consequently,

we will not assume for purposes of this appeal that Judge Williams and Melton are related; that Melton owed him money; or that any bias existed.

### III. Conclusion

The Monroe Circuit Court committed no error.  We therefore AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Billy Melton, *pro se*
West Liberty, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Perry T. Ryan
Assistant Attorney General
Frankfort, Kentucky